SMITH, Circuit Judge,
Dissenting.
This case turns on whether the dispute between U.S. Airways, Inc. (“US Airways” or “the Company”) and the International Association of Machinists and Aerospace Workers (the “IAM”) is characterized as “major” or “minor” for purposes of the Railway Labor Act, 45 U.S.C. §§ 151 et seq. (“RLA”). The majority holds that it is a minor one “because both parties have asserted rights existing under the [collective bargaining agreement], the dispute turns on the proper interpretation or application of the CBA, and U.S. Airways’ argument is neither frivolous nor obviously insubstantial.” Supra at 260-61. I agree with the majority that the parties’ dispute is resolved by application of the CBA and the interpretation of its terms. Where I part company with my colleagues is in them conclusion that U.S. Airways’ position is not frivolous. I agree, instead, with the District Court that, “[u]nder the guise of a claimed dispute about meaning of language in the CBA, [US Airways] is attempting to remake or amend the most elemental and consequential provisions of the CBA.” Because I believe that U.S. Airways has not presented a construction of the contract that even arguably supports its position, I respectfully dissent.
A genuine dispute over the “ ‘meaning or proper application of a particular provision’ ” in the parties’ collective bargaining agreement is “minor,” and subject to the exclusive jurisdiction of the System Board of Adjustment. Consol. Rail Corp. v. Ry. Labor Executives’ Ass’n (“Conrail”), 491 U.S. 299, 303-04, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (quoting Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)). A “major” dispute, on the other hand, arises “where there is no such agreement or where it is sought to change the terms of one.” Conrail, 491 U.S. at 302, 109 S.Ct. 2477 (quoting Burley, 325 U.S. at 723, 65 S.Ct. 1282) (emphasis added). The RLA prescribes “a lengthy process of bargaining and mediation” for major disputes, during which time the “parties are obligated to maintain the status quo.” Conrail, 491 U.S. at 302-03, 109 S.Ct. 2477. The district courts have jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury. Id. at 303, 109 S.Ct. 2477.
The Supreme Court in Conrail explicitly recognized that any capable advocate can massage an attempt to change the terms of an agreement into a question of contract interpretation, and that deferring to every such argument as a matter of course would undermine the basic structure of the RLA:
[T]here is a danger in leaving the characterization of the dispute solely in the hands of one party. In a situation in which the party asserting a contractual basis for its claim is “insincere” in doing so, or its “position [is] founded upon ... insubstantial grounds,” the result of honoring that party’s characterization *264 would be to undercut “the prohibitions of § 2, Seventh, and § 6 of the Act” against unilateral imposition of new contractual terms. In such circumstances, protection of the proper functioning of the statutory scheme requires the court to substitute its characterization for that of the claimant.
Conrail, 491 U.S. at 306, 109 S.Ct. 2477 (quoting Norfolk & Portsmouth Belt Line R.R. Co. v. Bhd. of R.R. Trainmen, 248 F.2d 34, 43-44 n. 4 (4th Cir.1957)).[6] Under Conrail, a dispute is minor only where the parties’ positions are “arguably justified” by the terms of their agreement:
Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties’ collective-bargaining agreement. Where, in contrast, the employer’s claims are frivolous or obviously insubstantial, the dispute is a major one.
Conrail, 491 U.S. at 307, 109 S.Ct. 2477.
In holding that the dispute between the parties is minor rather than major, the majority concludes that the District Court “impermissibly interpreted the CBA.” Supra at 261. Of course, the District Court had no choice but to interpret the CBA in order to determine whether it arguably justifies U.S. Airways’ position. See Conrail, 491 U.S. at 306-07, 109 S.Ct. 2477; see also S.E. Penn. Transp. Auth., 882 F.2d at 784-85 (discussing the sources to be considered when interpreting a CBA to determine whether a party’s position is arguably justified). A court’s interpretation is impermissible under Conrail only if it elects among multiple, non-frivolous constructions of the terms of the agreement. By stating that the District Court “imper-missibly interpreted the CBA,” the majority, it seems to me, only invites the question: is U.S. Airways’ position grounded on a non-frivolous construction of the parties’ agreement?[7]
The majority does not really answer this question, but rather repeats U.S. Airways argument that the second sentence of Section (G), read alone, supports its position *265 that any work may be contracted out to a vendor when the Company lacks the skills, equipment or facilities to perform the work in house. Supra at 258; compare Appellant’s Br. at 22. Yet two critical issues remain: (1) whether the-second sentence of Section (G), read alone, arguably supports U.S. Airways’ position, and (2) whether that sentence can arguably be read alone?
I believe that both issues must be resolved in the negative. US Airways’ interpretation of the second sentence of Section (G) hinges on a logical fallacy. That sentence states: “Work subcontracted out to a vendor will be of the type that cannot be manufactured or repaired in-house by existing skills/equipment or facilities of the Company.” From this, U.S. Airways argues: (1) S-Checks cannot be repaired in-house using existing equipment and facilities; (2) therefore, S-Checks are work that can be subcontracted out. Yet this argument is a classic non sequitur. It is as if U.S. Airways had argued: (1) All precedential opinions of the Third Circuit will be of the type published in the Federal Reporter; (2) Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21 (2d Cir.1962), is published in the Federal Reporter; (3) therefore, Rutland is a precedential opinion of the Third Circuit.
US Airways’ argument would be valid (and therefore arguable) if the second sentence of Section (G) actually read: “Work of the type that cannot be manufactured or repaired in-house by existing skills/equipment or facilities of the Company will be subcontracted out to a vendor.”[8] This is not the language of the text, however, and U.S. Airways offers no argument or explanation why we should reverse the subject and predicate of the second sentence of Section (G). The Company simply presents the implicit and fallacious ipse dixit that this is how the sentence should be read. Such argumentation is, in my view, obviously insubstantial.
Whether S-Checks can be performed using existing skills/equipment therefore tells the reader little about whether S-Checks can be outsourced. Indeed, the second sentence of Section (G), standing alone, provides no basis for determining what work may be outsourced. Which leads to the second issue that I believe the majority has left unresolved: can the second sentence of Section (G) arguably be read standing alone? In my view, the District Court was correct in concluding that it cannot. That sentence states that “[w]ork subcontracted out to a vendor will be of’ a certain type. It therefore has no practical meaning without a prior definition of “[w]ork subcontracted out.” The second sentence of Section (G) thus can be read only as a clarification of the first sentence, which, as an enumerated exception to Article 2(B)’s requirement that work be performed in-house, provides such a definition. That is, the second sentence clarifies the “[t]ypes of work customarily contracted out” that will continue to be contracted out under the CBA.
All of this is apparent from the plain language of the CBA. It is also clear from the System Board of Adjustment’s opinion in the Dunsford Arbitration, which U.S. Airways insists is part of the CBA and binding on the parties. See supra at 258. As the majority points out, the issue before the System Board in the Dunsford Arbitration was whether U.S. Airways could outsource certain engine overhaul *266 work because it lacked the facilities to perform the work in-house. US Airways attempted to justify the outsourcing under Sections (G) and (I) of the Second Clarification. The Board held that Section (G) did not authorize outsourcing because U.S. Airways had performed similar engine overhaul work in-house:
Although the Company has never overhauled a CFM-56 engine in house, it has performed overhaul work on [a different] series of engines since the early 1970s. Hence, the “type” of work which is in arbitration is the work of engine overhaul, no [sic] the overhaul of a particular engine.... If work on the new part is of a “type” that previously was performed on other parts, it does not come within the exception of [Section] (G)....
... The quantity of work [that U.S. Airways] has done on [similar engines] over many years is quite substantial, and clearly establishes that this “type of work” is not customarily contracted out.
(Emphasis added). The System Board’s opinion reiterates the only arguable reading of the CBA: the Section (G) exception is limited to “[t]ypes of work customarily contracted out.”[9]
Again, all of this is clear from the CBA. More important for purposes of the RLA, however, is the fact that U.S. Airways offers no explanation for how the second sentence of Section (G) supports its position, or how its construction of that sentence can be harmonized with the rest of the contract. Having adopted a logically invalid conclusion from the text of the CBA; having contradicted a dispositive decision of the System Board; having ignored the elementary canon that a contract must be read as a whole, and that individual provisions must be read in their context and not in a vacuum, see In re New Valley Corp., 89 F.3d 143, 149 (3d Cir.1996); having abandoned the equally fundamental canon that a contract must be read so as to give effect to all of its parts, see New Wrinkle, Inc. v. John L. Armitage & Co., 238 F.2d 753, 757 (3d Cir.1956);[10] US Airways was obliged to offer *267 some logical argument why its interpretation makes sense. No such argument was attempted by U.S. Airways, and this failure should be fatal under Conrail.
Instead, U.S. Airways puts forth an alternative argument that the “equipment and facilities” clause in Article 2(B) is actually an exception to Article 2(B)’s requirement that work be performed in-house. Not only is this alternative argument frivolous, it confirms the absence of any justification for U.S. Airways’ Section (G) argument. The “equipment and facilities” clause provides:
It is the Company’s intent, however, to utilize all its equipment and facilities in performing work in its own organization. In the event that a situation should develop whereby the equipment and facility limitations are not available or sufficient to perform such work, the Company will confer with the Union in an effort to reach an understanding with respect to how the problem is to be resolved.
This clause does not purport to allow U.S. Airways to take any unilateral action at all. Instead, it simply requires the parties to “confer.” The System Board of Adjustment made this very point in the Dunsford Arbitration, rejecting U.S. Airways’ reliance on the equipment and facilities clause as outsourcing authority. US Airways thus attempts to revive two arguments explicitly rejected by the System Board, while at the same time insisting that the Dunsford Arbitration is part of the CBA and binding on the parties. See supra at 258. Rather than support a broad right to outsource, the “equipment and facilities” clause demonstrates that the parties contemplated a variety of situations in which “equipment and facility limitations are not available or sufficient,” but restricted U.S. Airways’ right to outsource to certain narrowly defined situations.
I see this situation as similar to that confronted by the Seventh Circuit in Brotherhood of Maintenance of Way Employees v. Atchison, Topeka & Santa Fe Railway Co., 138 F.3d 635 (7th Cir.1997). The dispute in that case was whether the parties’ collective bargaining agreement required the railroads to compensate maintenance workers for travel expenses. Id. at 638. According to the union, the CBA obligated the railroads to compensate all traveling employees, whereas the railroads insisted that their obligation was limited to reimbursing “regional and system gangs.” Id. The CBA, however, simply referred to “employees.” Id. at 640. The Seventh Circuit rejected the railroads’ attempt to construe “employees” narrowly:
Either [parties’] view is logically possible; neither is barred by the explicit terms of Article XIV. But while the term “employees” could refer solely to regional and system gangs, there is no hint in Article XIV that “employees” actually bears the narrower meaning.... The railroads propose a theoretically plausible distinction, but one that has no basis in the text. We would hold the railroads’ view “frivolous or obviously insubstantial” and affirm the district court — if the act of interpretation were to stop at the four corners of the Agreement.[11]
*268 Id. Unlike the railroads in Atchison, U:S. Airways has failed to show that its arguments are even theoretically plausible. Rather, its Section (G) argument is sophistry, condemned by U.S. Airways’ alternative — and equally insubstantial — argument from Article 2(B).
Ultimately, my disagreement with the majority reflects a different assessment of the meaning and purpose of the “arguably justified” standard set forth by the Supreme Court in Conrail for distinguishing between major and minor disputes. Conrail, as I noted above, explicitly recognized that any good lawyer can plead a major dispute as a question of contract interpretation, but that parties cannot circumvent the RLA’s status quo requirement with “frivolous,” or “obviously insubstantial” arguments. Conrail, 491 U.S. at 306-07, 109 S.Ct. 2477; see also Detroit & Toledo Shore Line R.R. Co. v. United Trans. Union, 396 U.S. 142, 150, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) (“The Act’s status quo requirement is central to its design.... [T]he power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worth-while for the moving party to compromise with the interests of’the other side and thus reach agreement without interruption to commerce.”). Because I believe that the majority is allowing the proffer of an argument, in and of itself, to satisfy U.S. Airways’ already “relatively light burden,” Conrail, 491 U.S. at 307, 109 S.Ct. 2477, I respectfully dissent.

. See also Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 265-66, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) ("Recognizing that accepting a party’s characterization of a dispute as 'minor' ran the risk of undercutting the RLA's prohibition 'against unilateral imposition of new contractual terms,' the Court [in Conrail] held that a dispute would be deemed minor only if there was a sincere, nonfrivo-lous argument that it turned on the application of the existing agreement, that is, if it was 'arguably justified' by that agreement.”); S.E. Penn. Transp. Auth. v. Bhd. of R.R. Signalmen, 882 F.2d 778, 783 (3rd Cir.1989) (explaining that the Conrail standard should not "allow a party to utilize the minor dispute resolution procedures by simply pleading that the dispute is resolvable by reference to an existing collective bargaining agreement” and that "courts can exercise some judicial control over the label to be affixed to the dispute”); Rutland Ry. Corp. v. Bhd. of Locomotive Eng’rs, 307 F.2d 21, 33 (2d Cir.1962) ("In [deciding if a dispute is major or minor] we must not place undue emphasis on the contentions or the maneuvers of the parties. Management will assert that its position, whether right or wrong, is only an interpretation or application of the existing contract. Unions, on the other hand, in their assertions about the dispute at issue, will obviously talk in terms of change.”).

. I take issue with the majority’s characterization that the District Court "based its decision” on the parties' past practice and bargaining history. Supra at 261 -62 n. 4. The District Court simply read the CBA and concluded — as I do — that it lends no support to U.S. Airways' position. Having arrived at what it concluded was the only arguable interpretation of the CBA, the District Court went on to state that it had "confidence” in its conclusion based on the parties’ past practice and bargaining history. To the extent that these sources were considered by the District Court, they were used merely to confirm the plain text of the CBA, not to interpret the CBA in the first instance.

. Likewise, the hypothetical conclusion given above would be valid if the first premise stated: “All opinions of the type published in the Federal Reporter will be precedential opinions of the Third Circuit.”

. The Board did conclude that outsourcing was authorized under Section (I), which provides: "Due to lack of facilities, the Company may subcontract the major overhaul of aircraft engines during the life of this Agreement.” US Airways' argument that there is an inconsistency between the Board opinion and Section (I) is a red herring. Because the Board explicitly found Section (G) inapplicable, any inconsistency can only have relevance to the meaning of Section (I). In other words, Section (I) may very well apply due to lack of equipment and skills as well as "due to lack of facilities.” But this is irrelevant to the dispute at hand, because U.S. Airways does not contend that Section (I) justifies the outsourcing of S-Checks.
US Airways takes liberties with the Duns-ford Arbitration that are simply unsupportable. The System Board addressed U.S. Airways' arguments under Sections (G) and (I) in succession. In its 33-page opinion, the Board disposed of U.S. Airways’ Section (G) argument in just over a single page. The System Board devoted the remaining seven pages of its opinion to U.S. Airways’ Section (I) argument (Section (G) is not mentioned again in the opinion). It is in this context that the Board stated: "the operative standard in the relationship of the parties has been whether the Company possessed the requisite skills, equipment and facilities to do certain engine overhaul work.” (Emphasis added). Of course, U.S. Airways in its brief conveniently omits the italicized portion of this quote, which places the Board's allegedly inconsistent statement squarely in the context of Section (I).

. US Airways' construction of the CBA renders Section (I) of the Second Clarification superfluous. If, as U.S. Airways argues, the second sentence in Section (G) allows U.S. Airways to outsource all work that cannot be performed due to lack of facilities, there would be no need for a separate Section (I) specifically dealing with the outsourcing of engine overhaul work "[d]ue to lack of facilities.”

. The court in Atchison nevertheless found support for the railroad's argument in the parties' bargaining history. Id. at 640-43; see Conrail, 491 U.S. at 311, 109 S.Ct. 2477 (stating that courts must consider both implied and express terms of a CBA, as well as the parties' practice, usage, and custom). US Airways states that it relies on the parties past practice of subcontracting aircraft maintenance work when in-house equipment or facilities are lacking. But the only “aircraft maintenance work” that U.S. Airways claims to have outsourced is the engine overhaul work that was the subject of the Dunsford Arbitration. US Airways "past practice” of doing something explicitly authorized by Sec- *268 üon (I) provides no insight into the meaning of Section (G) or Article 2(B).