

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-3-2004

# Intl Assn Machinists v. US Airways Inc

Precedential or Non-Precedential: Precedential

Docket No. 03-4169

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Intl Assn Machinists v. US Airways Inc" (2004). *2004 Decisions.* Paper 967.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/967

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

No. 03-4169

INTERNATIONAL ASSOCIATION OF
MACHINISTS
AND AEROSPACE WORKERS;
INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS
DISTRICT LODGE 141-M

v.

US AIRWAYS, INC.,

Appellant

On Appeal from the United States
District Court
for the Western District of Pennsylvania
(D.C. Civ. No. 03-01496)
Honorable Robert J. Cindrich,
District Judge

Argued January 12, 2004

BEFORE: BARRY, SMITH, and
GREENBERG, Circuit Judges

(Filed: February 3, 2004)

Tom A. Jerman
Rachel A. Shapiro
Aparna B. Joshi
O'Melveny & Meyers
1625 Eye Street, N.W.
Washington, DC 20006

Robert A. Siegel (argued)
O'Melveny & Meyers
400 South Hope Street
15th Floor
Los Angeles, CA 90071-2899

Sidney Zonn
Littler Mendelson, P.C.
625 Liberty Avenue
Dominion Tower, 26th Floor
Pittsburgh, PA 15222

Kristine G. Derewicz
Littler Mendelson, P.C.
1601 Cherry Street
Three Parkway, Suite 1400
Philadelphia, PA 19102-1321

Attorneys for Appellant

Michael J. Healey
Healey & Hornack
429 Fourth Avenue
Law & Finance Building, 5th Floor
Pittsburgh, PA 15219

Ira L. Gottlieb (argued)
Robert A. Bush
Geffner & Bush
3500 West Olive Avenue
Suite 1100
Burbank, CA 91505-4657

David Neigus
9000 Machinists Place
Upper Marlboro, MD 20772-2687

Attorneys for Appellees

---

OPINION OF THE COURT

---

GREENBERG, Circuit Judge.

This matter comes on on appeal from an order of the district court dated and entered on October 21, 2003, barring US Airways, Inc. ("US Airways" or the "Company") from using an outside contractor to perform maintenance overhauls called S-Checks, mandated by the Federal Aviation Administration ("FAA"), on the Company's narrow body Airbus aircraft. The district court concluded that the dispute between US Airways and the International Association of Machinists and Aerospace Workers (the "IAM") over whether such subcontracting was permissible constituted a major dispute under the Railway Labor Act, 45 U.S.C. § 151 et seq. ("RLA").[1] For the reasons set forth below, we hold that the dispute is a minor one under the RLA, and therefore

---

[1] The Railway Labor Act has covered the airline industry since 1936. See Independent Ass'n of Continental Pilots v. Continental Airlines, 155 F.3d 685, 689 (3d Cir. 1998).

the district court lacked jurisdiction to issue the preliminary injunction.

## I. BACKGROUND

### A. Factual Background

The IAM is an unincorporated labor organization that is the certified collective bargaining representative of US Airways' mechanics and related personnel. District Lodge 141-M is the IAM's negotiating arm. For more than 50 years, the IAM and US Airways have been parties to collective bargaining agreements governing US Airways' mechanics and related employees. On August 11, 2002, US Airways filed for Chapter 11 bankruptcy and implemented measures to reduce its operating costs. These measures included renegotiating the terms of its collective bargaining agreements, rejecting certain aircraft leases, rejecting real property leases, reducing wages and benefits for its management and non-union employees, and rejecting or renegotiating other agreements with its lessors, vendors, and suppliers.

#### 1. The S-Check Requirement

FAA guidelines require US Airways to perform S-Checks on its narrow body Airbus aircraft every five years. S-Checks are the most extensive type of scheduled maintenance checks, requiring a detailed inspection of the

2

aircraft and repair of any discrepancies on the airframe, components, and engines. US Airways' first S-Check (on an aircraft it acquired in 1998) became due on October 15, 2003. US Airways had nine other S-Checks due by the end of 2003 and seven others are due in September 2004. As of January 2005, S-Checks will be required on an ongoing basis.

US Airways emerged from bankruptcy on March 31, 2003. It claims that until that time it could not properly arrange for the ten S-Checks that were due in 2003. At some point before October 6, 2003, US Airways told the IAM that it may need to hire a vendor to perform the S-Checks because it lacked the necessary equipment and facilities to perform them itself. On October 6, 2003, US Airways confirmed this need with the IAM with regard to its first ten S-Checks, but it said it would work with the IAM to identify means by which the remaining S-Checks could be performed in house.

2. The Collective Bargaining Agreement ("CBA")

a. The Scope Clause (Article 2(B))

Article 2(B) of the CBA defines the scope of the work to be performed by IAM-represented employees:

The Company agrees that the following

described work, wherever performed, is recognized as coming within the jurisdiction of the [IAM], and is covered by this Agreement: . . . all work involved in dismantling, overhauling, repairing, fabricating, assembling, welding, and erecting all parts of airplanes, airplane engines, avionics equipment, electrical system, heating system, hydraulic system, and machine tool work in connection therewith . . . .

. . . .

The duties of aircraft cleaning, lavatory servicing, potable water servicing, receipt and dispatch, ancillary duties associated with receipt and dispatch, and operation of ground power units may be performed by employees covered by this Agreement and/or other employees and vendors as described in Article 4 paragraphs J and N at those

3

locations/shifts where such covered employees are not staffed. Aircraft towing may be performed by employees not covered by this Agreement at those locations/shifts where such covered employees are not staffed. It is not the intent of this paragraph to have non-Mechanical and Related employees perform such work on shifts where covered employees are staffed except as provided for elsewhere in this agreement. It is the Company's intent, however, to utilize all its equipment and facilities in performing work in its own organization. In the event that a situation should develop whereby the equipment and facility limitations are not available or sufficient to perform such work, the Company will confer with the Union in an effort to reach an understanding with respect to how the problem is to be resolved. Receipt and dispatch, including the ancillary duties associated with receipt and dispatch, of Commuter Aircraft may be accomplished by employees not covered by the mechanic and related agreement.

JA 170; Appellees' br. at 7.[2] The parties do not dispute that the scope language encompasses airframe heavy maintenance ("HMV") work, which is the type of work an S-Check requires.

There are two addenda to the CBA: (1) the "Letter of Clarification" (the "First Clarification"); and (2) "Clarification of Article 2(B)" (the "Second Clarification").

b. The First Clarification

The First Clarification states that "Section (B) of said Article 2 is recognized by both parties as prohibiting the 'farming out' of the types of work specified in said Section (B)." JA 194.

c. The Second Clarification

The Second Clarification states that:

Relative to [the Scope

_____

[2]References to "JA" refer to the joint appendix filed in this court.

4

clause], it is agreed that, within the limits hereinafter specified, the following listed exceptions to the coverage of Article 2 shall not be deemed in violation thereof:

. . .

(G) Types of work customarily contracted out, such as parts and material which the Company could not be expected to manufacture, such as engine and airframe parts, castings, cowlings, seats, wheels and other items which are commonly manufactured as standard items for the trade by vendors. Work subcontracted out to a vendor will be of the type that cannot be manufactured or repaired in-house by existing skills/equipment or facilities of the Company.

. . . .

(I) Due to lack of facilities, the Company may subcontract the major overhaul of aircraft engines during the life of this Agreement.

JA 195-96. The IAM notes that neither HMV nor other maintenance work on aircraft airframes is mentioned in the list of subcontracting "exceptions." The parties agree that HMV work is not the type of work that customarily has been contracted out.

### 3. Bargaining History

The IAM presents to the court past conduct on the part of US Airways regarding the subcontracting of HMV work on its Boeing fleet. Specifically, the IAM notes that during negotiations in 1999 for a successor agreement (a major dispute), US Airways sought to obtain the right to subcontract Q-Checks of its Boeing fleet, claiming that it lacked the facilities to perform the work. The IAM rejected US Airways' proposal, and thus, US Airways did not achieve the right to subcontract the Q-Checks.

### 4. The Parties' Practice

US Airways never has subcontracted HMV work in its 54-year relationship with the IAM. Rather, IAM-represented employees always have performed such work, regardless of the model of the aircraft. The IAM claims that the Company acquired a hangar in Tampa, Florida, where it could have

5

performed the S-Checks, although it voluntarily closed the facility in November 2002.

### 5. The Dunsford Arbitration

US Airways presents evidence of an arbitration between it and the IAM in 1991-1992 before the US Airways-IAM System Board of Adjustment/Arbitration ("System Board") which Professor John Dunsford decided (the "Dunsford Arbitration"). The issue before the System Board was whether US Airways could outsource engine overhaul work because it lacked the facilities to perform the work in house. Professor Dunsford decided that it could, noting that the IAM had not met its burden of showing that there were facilities to do the work in house. While the parties agree that this award has become part of the CBA, they dispute its meaning. US Airways claims that Professor Dunsford relied on the second sentence of Section (G) of the Second Clarification in holding that even though the engine overhaul work customarily had not been contracted out, US Airways could do so in that case because it lacked the facilities to do the work in house. In contrast, the IAM believes that Professor Dunsford relied solely on Section (I), which creates a specific exception for aircraft engine overhauling where there is a lack of facilities.

### B. Procedural Background

On August 4, 2003, the IAM notified US Airways that use of an outside vendor for the S-Checks would violate the scope of the CBA and would create a major dispute. US Airways countered on August 8, 2003, that because the parties differed as to the interpretation of the CBA regarding whether S-Checks could be subcontracted, the dispute was a minor one. Thus, US Airways attempted to submit the dispute to the System Board, but the IAM refused to arbitrate the dispute.

On October 6, 2003, the IAM moved in the district court for a temporary restraining order and preliminary injunction barring US Airways from using an outside vendor for the S-Checks.[3] The IAM argued that the CBA required US Airways to use IAM employees for its S-Checks and that use of an outside vendor constituted a

---

[3]The IAM included in its supporting papers declarations explaining how US Airways could perform the Airbus HMV work in house with existing facilities, equipment, and mechanics, both active and on layoff status. It also provided a declaration from William Freiberger, who was the IAM's chief negotiator in the 1999 negotiations, in which he stated that during the course of the 1999 negotiations US Airways had negotiated for the right to subcontract HMV work on its Boeing fleet, but never attained that right.

6

major dispute, requiring maintenance of the status quo.

After oral argument, the district court held on October 21, 2003, that the dispute was a major one and it preliminarily enjoined US Airways from using an outside vendor for the S-Checks. It held that US Airways' arguments under the CBA were "obviously insubstantial" and that it was "attempting to remake or amend" the CBA's prohibition against HMV subcontracting. JA 18.

US Airways filed a notice of appeal and a motion for stay pending appeal. After a hearing, the district court denied US Airways' request for a stay, but it modified its injunction to permit US Airways to complete work on one partially disassembled aircraft. On October 27, 2003, US Airways moved in this court for an emergency stay pending appeal, which a motion panel denied on November 5, 2003, though at the same time it expedited the appeal. On January 12, 2004, we heard oral argument on US Airways' appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

Jurisdiction over the appeal of a preliminary injunction is proper pursuant to 28 U.S.C. § 1292(a)(1). We exercise plenary review over the question of whether the dispute is a major or minor

one. See General Comm. of Adjustment v. CSX R.R. Corp., 893 F.2d 584, 589 (3d Cir. 1990) ("CSX"). We review factual findings under the clearly erroneous standard. See Shire US Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003).

## III. DISCUSSION

A. Major vs. Minor Disputes

1. The Guidelines

"The Railway Labor Act is the product of a joint effort by labor and management representatives to channel labor disputes into constructive resolution procedures as a means of avoiding interruptions to commerce and preventing strikes." CSX, 893 F.2d at 589. The two types of disputes that can arise under the RLA are major disputes and minor disputes. In Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 109 S.Ct. 2477 (1989) ("Conrail"), the Supreme Court explained that "the formal demarcation between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help." Id. at 305, 109 S.Ct. at 2481. Rather, the difference between the two types of disputes is that major disputes seek to create contractual rights, while minor disputes seek to enforce them. See id. at

302, 109 S.Ct. at 2480 (holding that the inclusion of drug testing as part of railroad's physical examinations arguably was justified by implied terms of collective bargaining agreement, and therefore dispute was minor); see also Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290 (1945).

Major disputes relate to the formation of collective bargaining agreements or efforts to secure them. They arise in the absence of such an agreement or where a party seeks to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. Major disputes look to the acquisition of rights for the future, not to the assertion of rights claimed to have vested in the past. See Conrail, 491 U.S. at 302, 109 S.Ct. at 2480. As the Supreme Court stated in Conrail,

> [i]n the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation. . . . Until they have exhausted those procedures, the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions.

The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury.

Id. at 302-03, 109 S.Ct. at 2480.

In contrast, minor disputes arise out of grievances or out of the interpretation or application of existing collective bargaining agreements. See id. at 303, 109 S.Ct. at 2481. "The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." Id. Where an employer asserts a contractual right to take the contested action, the ensuing dispute is a minor one if the action arguably is justified by the implied or express terms of the parties' collective bargaining agreement. Where, by contrast, the employer's claimed justification for the action is frivolous or obviously insubstantial, the dispute is a major one. See id. at 310, 109 S.Ct. at 2484; see also CSX, 893 F.2d at 593 (noting that the court may not "consider the merits of the underlying dispute; its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision").

A minor dispute is subject to a

8

compulsory and binding arbitration before an adjustment board established by the employer and the unions representing the employees. That board, in this case the System Board, has exclusive jurisdiction over the dispute. There is no general statutory obligation that the employer maintain the status quo pending the arbitrator's decision. See Conrail, 491 U.S. at 302, 109 S.Ct. at 2481. Thus, in a minor dispute, "[e]ach side can act on its interpretation of the existing agreements until the arbitration panel rules otherwise." CSX, 893 F.2d at 594 (citations omitted).

### 2. The Instant Dispute

We hold that the instant dispute is a minor one because both parties have asserted rights existing under the CBA, the dispute turns on the proper interpretation or application of the CBA, and US Airways' argument is neither frivolous nor obviously insubstantial.

#### a. Both Parties Assert Rights Under the CBA

Both parties contend that the terms of the existing CBA either establish or refute the presence of the right to subcontract S-Checks. The IAM contends that the dispute can be resolved by reference to the following: (1) the scope clause (Article 2(B)) (which includes HMV work); (2) the First Clarification (which prohibits the "farming out" of work included in the scope clause); (3) the Second Clarification (which does not contain an exception for HMV work); and (4) US Airways' past practice of performing all HMV work in house.

In US Airways' view, the dispute can be resolved by reference to the following: (1) the scope clause (Article 2(B)) (which includes HMV work); (2) the "facilities and equipment" clause of Article 2(B) (which contains a meet and confer obligation when the Company lacks adequate equipment or facilities to perform the work); (3) the Second Clarification, Section (G), second sentence (which states that US Airways may contract out work for which it lacks the skills, equipment or facilities to perform the work in house); (4) the Dunsford Award (upholding right to subcontract engine overhaul work when in house facilities are lacking); (5) the past practice of subcontracting aircraft maintenance work when in house equipment or facilities are lacking; and (6) the absence of any past practice of performing Airbus S-Checks.

Thus, both parties contend that terms of the CBA, as interpreted through custom and past experience, determine the result in this case.

#### b. US Airways' Argument is Neither Frivolous Nor Obviously Insubstantial

As described below, we hold that the district court erred in finding US Airways' position to be frivolous and

9

obviously insubstantial.

### 1. US Airways' Section (G) Argument

Section G of the Second Clarification reads as follows:

> (G) Types of work customarily contracted out, such as parts and material which the Company could not be expected to manufacture, such as engine and airframe parts, castings, cowlings, seats, wheels and other items which are commonly manufactured as standard items for the trade by vendors. Work subcontracted out to a vendor will be of the type that cannot be manufactured or repaired in-house by existing skills/equipment or facilities of the Company.

JA 196. US Airways argues that the second sentence of Section (G), read alone, supports its position that any work may be contracted out to a vendor when the Company lacks the skills, equipment or facilities to perform the work in house. In concluding that this sentence "can only be read as a clarification of the first sentence," JA 16, the district court impermissibly interpreted the CBA.[4] As

---

[4]The district court based its decision on the following factors: (1) the "longstanding and uninterrupted practice" of performing "heavy maintenance types of work"; (2) the "fact that such work has always been considered within the exclusive province of those employees . . . as evidenced by the aforementioned history"; and (3) the fact that US Airways in 1999 asked the IAM to allow it to subcontract Q-Checks on Boeing aircraft because of a backlog of that work. JA 17. It further opined that under US Airways' interpretation of Section (G), US Airways "could unilaterally void the entire CBA based on such interpretation simply by not providing IAM-represented employees with adequate facilities or tools to perform their work." JA 17-18.

With regard to the 1999 history, US Airways argues that it did not have an adequate opportunity to respond to the IAM's factual allegations, but that in any event this past negotiation is distinguishable because there US Airways was seeking permission to subcontract work for which it had adequate equipment and facilities. US Airways correctly notes that the district

10

US Airways correctly explains, the district court's analysis went beyond determining whether the CBA resolved the dispute; instead, it performed the task of the arbitrator in determining the proper construction of Section (G). Of course, under US Airways' view, the district court's action was impermissible even if it correctly interpreted the CBA.

### 2. US Airways' Dunsford Award Argument

US Airways argues that the Dunsford Award is indicative that the second sentence of Section (G) is free standing. It claims that Professor Dunsford concluded that engine overhaul work customarily was not contracted out, but nonetheless US Airways could contract it out because it did not have the facilities and equipment needed to perform the work in house. Thus, US Airways argues that the second sentence of Section (G) gives it authority to contract out S-Checks where it lacks the facilities and equipment to perform them in house, even though this is not the type of work customarily contracted out. US Airways also counters the IAM's argument that the Dunsford Award was based solely on Section (I)[5], and not on

court's reliance on this bargaining history is attenuated given that the court did not review the bargaining history of Section (G).

[5]Section (I) states as follows: "Due to lack of facilities, the Company may

Section (G), by stating that "[a]lthough the IAM has argued that the Dunsford Award was based on Section (I) of the [Second Clarification], which applies only to engine maintenance, that could not have been the basis for the decision because Section (I) refers only to lack of 'facilities,' and not lack of equipment or skills." Appellant's br. at 27.

### 3. US Airways' Equipment and Facilities Clause Argument

US Airways also argues that the district court failed to acknowledge the "equipment and facilities clause" of Article 2(B), which states that "[i]n the event that a situation should develop whereby the equipment and facility limitations are not available or sufficient to perform such work, the Company will confer with the Union in an effort to reach an understanding with respect to how the problem is to be resolved." JA 170. US Airways argues that this clause creates at least an implied right to subcontract where the Company does not have adequate equipment or facilities. US Airways further argues that under the Dunsford Award, this clause applies whenever work is covered by the agreement (e.g. HMV work), and not where the work is subject to an express exception under the Second Clarification, such as Section (G). As such, it

subcontract the major overhaul of aircraft engines during the life of this Agreement." JA 196.

11

concludes that even if the second sentence of Section (G) applied only to work "customarily contracted out," the equipment and facilities clause of Article 2(B) "creates an independent basis for the Company's right to subcontract S-Checks."  Appellant's br. at 31.

Based on these arguments, we hold that US Airways has met its "relatively light" burden, see Conrail, 491 U.S. at 307, 109 S.Ct. 2482 (citation omitted), of asserting rights under the CBA that are neither frivolous nor obviously insubstantial.  But we do not go further and state a view as to whether we ultimately agree with US Airways or the IAM as it is not our responsibility to make such a determination.  Rather, we leave the merits of the parties' arguments to the System Board, and merely will lift the preliminary injunction because there is no requirement that the status quo be maintained in this minor dispute.

## IV.  CONCLUSION

For the reasons stated above, the order of the district court dated and entered on October 21, 2003, will be reversed and this matter will be remanded to the district court for further proceedings consistent with this opinion.

SMITH, Circuit Judge, Dissenting:

This case turns on whether the dispute between US Airways, Inc. ("US Airways" or "the Company") and the International Association of Machinists and Aerospace Workers (the "IAM") is characterized as "major" or "minor" for purposes of the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* ("RLA").  The majority holds that it is a minor one "because both parties have asserted rights existing under the [collective bargaining agreement], the dispute turns on the proper interpretation or application of the CBA, and US Airways' argument is neither frivolous nor obviously insubstantial."  *Supra* at 13.  I agree with the majority that the parties' dispute is resolved by application of the CBA and the interpretation of its terms.  Where I part company with my colleagues is in their conclusion that US Airways' position is not frivolous.  I agree, instead, with the District Court that, "[u]nder the guise of a claimed dispute about meaning of language in the CBA, [US Airways] is attempting to remake or amend the most elemental and consequential provisions of the CBA."  Because I believe that US Airways has not presented a construction of the contract that even arguably supports its position, I respectfully dissent.

A *genuine* dispute over the "'meaning or proper application of a particular provision'" in the parties'

12

collective bargaining agreement is "minor," and subject to the exclusive jurisdiction of the System Board of Adjustment. *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n ("Conrail")*, 491 U.S. 299, 303-04 (1989) (quoting *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945)). A "major" dispute, on the other hand, arises "where there is no such agreement or where it is sought *to change the terms of one*." *Conrail*, 491 U.S. at 302 (quoting *Burley*, 325 U.S. at 723) (emphasis added). The RLA prescribes "a lengthy process of bargaining and mediation" for major disputes, during which time the "parties are obligated to maintain the status quo." *Conrail*, 491 U.S. at 302-03. The district courts have jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury. *Id.* at 303.

The Supreme Court in *Conrail* explicitly recognized that any capable advocate can massage an attempt to change the terms of an agreement into a question of contract interpretation, and that deferring to every such argument as a matter of course would undermine the basic structure of the RLA:

> [T]here is a danger in leaving the characterization of the dispute solely in the hands of one party. In a situation in which the party asserting a

contractual basis for its claim is "insincere" in doing so, or its "position [is] founded upon . . . insubstantial grounds," the result of honoring that party's characterization would be to undercut "the prohibitions of § 2, Seventh, and § 6 of the Act" against unilateral imposition of new contractual terms. In such circumstances, protection of the proper functioning of the statutory scheme requires the court to substitute its characterization for that of the claimant.

*Conrail*, 491 U.S. at 306 (quoting *Norfolk & Portsmouth Belt Line R.R. Co. v. Bhd. of R.R. Trainmen*, 248 F.2d 34, 43-44 n.4 (4th Cir. 1957)).[6] Under

---

[6] *See also Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 265-66 (1994) ("Recognizing that accepting a party's characterization of a dispute as 'minor' ran the risk of undercutting the RLA's prohibition 'against unilateral imposition of new contractual terms,' the Court [in *Conrail*] held that a dispute would be deemed minor only if there was a

13

*Conrail*, a dispute is minor only where the parties' positions are "arguably justified" by the terms of their agreement:

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, incontrast, the employer's claims are frivolous or obviously insubstantial, the dispute is a major one.

*Conrail*, 491 U.S. at 307.

In holding that the dispute between the parties is minor rather than major, the majority concludes that the District Court "impermissibly interpreted the CBA." *Supra* at 14. Of course, the District Court had no choice but to interpret the CBA in order to determine whether it arguably justifies US Airways' position. *See Conrail*, 491 U.S. at 306-07; *see also S.E. Penn. Transp. Auth.*, 882 F.2d at 784-85 (discussing the sources to be considered when interpreting a CBA to determine whether a party's position is arguably justified). A court's interpretation is impermissible under *Conrail* only if it elects among multiple, non-frivolous constructions of the terms of the agreement. By stating that the District Court "impermissibly interpreted the CBA," the majority, it seems to me, only invites the question: is US Airways' position grounded on a non-frivolous construction of the parties'

---

sincere, nonfrivolous argument that it turned on the application of the existing agreement, that is, if it was 'arguably justified' by that agreement."); *S.E. Penn. Transp. Auth. v. Bhd. of R.R. Signalmen*, 882 F.2d 778, 783 (3rd Cir. 1989) (explaining that the *Conrail* standard should not "allow a party to utilize the minor dispute resolution procedures by simply pleading that the dispute is resolvable by reference to an existing collective bargaining agreement" and that "courts can exercise some judicial control over the label to be affixed to the dispute"); *Rutland Ry. Corp. v. Bhd. of Locomotive Eng'rs*, 307 F.2d 21, 33 (2d Cir. 1962) ("In [deciding if a dispute is major or minor] we must not place undue emphasis on the contentions or the maneuvers of the parties. Management will assert that its position, whether right or wrong, is only an interpretation or application of the existing contract. Unions, on the other hand, in their assertions about the dispute at issue, will obviously talk in terms of change.").

14

agreement?[7]

The majority does not really answer this question, but rather repeats US Airways' argument that "the second sentence of Section (G), read alone, supports its position that any work may be contracted out to a vendor when the Company lacks the skills, equipment or facilities to perform the work in house." *Supra* at 14; *compare* Appellant's Br. at 22. Yet two critical issues remain: (1) whether the second sentence of Section (G), read alone, arguably supports US Airways' position, and (2) whether that sentence can arguably be read alone?

I believe that both issues must be resolved in the negative. US Airways' interpretation of the second sentence of Section (G) hinges on a logical fallacy. That sentence states: "Work subcontracted out to a vendor will be of the type that cannot be manufactured or repaired in-house by existing skills/equipment or facilities of the Company." From this, US Airways argues: (1) S-Checks cannot be repaired in-house using existing equipment and facilities; (2) therefore, S-Checks are work that can be subcontracted out. Yet this argument is a classic *non sequitur*. It is as if US Airways had argued: (1) All precedential opinions of the Third Circuit will be of the type published in the Federal Reporter; (2) *Rutland Railway Corp. v. Brotherhood of Locomotive Engineers*, 307 F.2d 21 (2d Cir. 1962), is published in the Federal Reporter; (3) therefore, *Rutland* is a precedential opinion of the Third Circuit.

US Airways' argument would be valid (and therefore arguable) if the second sentence of Section (G) actually read: "Work of the type that cannot be manufactured or repaired in-house by existing skills/equipment or facilities of the Company will be subcontracted out to a vendor."[8] This is not the language of the text, however, and US Airways offers no argument or explanation *why* we

---

[7] I take issue with the majority's characterization that the District Court "based its decision" on the parties' past practice and bargaining history. *Supra* at 14-15 n.4. The District Court simply read the CBA and concluded—as I do—that it lends no support to US Airways' position. Having arrived at what it concluded was the only arguable interpretation of the CBA, the District Court went on to state that it had "confidence" in its conclusion based on the parties' past practice and bargaining history. To the extent that these sources were considered by the District Court, they were used merely to confirm the plain text of the CBA, not to interpret the CBA in the first instance.

[8] Likewise, the hypothetical conclusion given above would be valid if the first premise stated: "All opinions of the type published in the Federal Reporter will be precedential opinions of the Third Circuit."

should reverse the subject and predicate of the second sentence of Section (G). The Company simply presents the implicit and fallacious *ipse dixit* that this is how the sentence should be read. Such argumentation is, in my view, obviously insubstantial.

Whether S-Checks can be performed using existing skills/equipment therefore tells the reader little about whether S-Checks can be outsourced. Indeed, the second sentence of Section (G), standing alone, provides no basis for determining what work may be outsourced. Which leads to the second issue that I believe the majority has left unresolved: can the second sentence of Section (G) arguably be read standing alone? In my view, the District Court was correct in concluding that it cannot. That sentence states that "[w]ork subcontracted out to a vendor will be of" a certain type. It therefore has no practical meaning without a prior definition of "[w]ork subcontracted out." The second sentence of Section (G) thus can be read only as a clarification of the first sentence, which, as an enumerated exception to Article 2(B)'s requirement that work be performed in-house, provides such a definition. That is, the second sentence clarifies the "[t]ypes of work customarily contracted out" that will continue to be contracted out under the CBA.

All of this is apparent from the plain language of the CBA. It is also clear from the System Board of Adjustment's opinion in the Dunsford Arbitration, which US Airways insists is part of the CBA and binding on the parties. *See supra* at 8. As the majority points out, the issue before the System Board in the Dunsford Arbitration was whether US Airways could outsource certain *engine overhaul work* because it lacked the facilities to perform the work in-house. US Airways attempted to justify the outsourcing under Sections (G) and (I) of the Second Clarification. The Board held that Section (G) did not authorize outsourcing because US Airways had performed similar engine overhaul work in-house:

> Although the Company has never overhauled a CFM-56 engine in house, it has performed overhaul work on [a different] series of engines since the early 1970s. Hence, the "type" of work which is in arbitration is the work of engine overhaul, no [sic] the overhaul of a particular engine. . . . *If work on the new part is of a "type" that previously was performed on other parts, it does not come within the exception of [Section] (G). . . .*

16

. . . The quantity of work [that US Airways] has done on [similar engines] over many years is quite substantial, and clearly establishes that this "type of work" is not customarily contracted out.

(Emphasis added). The System Board's opinion reiterates the only arguable reading of the CBA: the Section (G) exception is limited to "[t]ypes of work customarily contracted out."[9]

---

[9] The Board did conclude that outsourcing was authorized under Section (I), which provides: "Due to lack of facilities, the Company may subcontract the major overhaul of aircraft engines during the life of this Agreement." US Airways' argument that there is an inconsistency between the Board opinion and Section (I) is a red herring. Because the Board explicitly found Section (G) inapplicable, any inconsistency can only have relevance to the meaning of Section (I). In other words, Section (I) may very well apply due to lack of equipment and skills as well as "due to lack of facilities." But this is irrelevant to the dispute at hand, because US Airways does not contend that Section (I) justifies the outsourcing of S-Checks.

Again, all of this is clear from the CBA. More important for purposes of the RLA, however, is the fact that US Airways offers no explanation for how the second sentence of Section (G) supports its position, or how its construction of that sentence can be harmonized with the rest of the contract. Having adopted a logically invalid conclusion from the text of the CBA; having contradicted a dispositive decision of the System Board; having ignored the elementary canon that a contract must be read as a whole, and that individual provisions must be read in

---

US Airways takes liberties with the Dunsford Arbitration that are simply unsupportable. The System Board addressed US Airways' arguments under Sections (G) and (I) in succession. In its 33-page opinion, the Board disposed of US Airways' Section (G) argument in just over a single page. The System Board devoted the remaining seven pages of its opinion to US Airways' Section (I) argument (Section (G) is not mentioned again in the opinion). It is in this context that the Board stated: "the operative standard in the relationship of the parties has been whether the Company possessed the requisite skills, equipment and facilities *to do certain engine overhaul work*." (Emphasis added). Of course, US Airways in its brief conveniently omits the italicized portion of this quote, which places the Board's allegedly inconsistent statement squarely in the context of Section (I).

17

their context and not in a vacuum, *see In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996); having abandoned the equally fundamental canon that a contract must be read so as to give effect to all of its parts, *see New Wrinkle, Inc. v. John L. Armitage & Co.*, 238 F.2d 753, 757 (3d Cir. 1956)[10]; US Airways was obliged to offer *some* logical argument why its interpretation *makes sense*. No such argument was attempted by US Airways, and this failure should be fatal under *Conrail*.

Instead, US Airways puts forth an alternative argument that the "equipment and facilities" clause in Article 2(B) is actually an exception to Article 2(B)'s requirement that work be performed in-house. Not only is this alternative argument frivolous, it confirms the absence of any justification for US Airways' Section (G) argument. The "equipment and facilities" clause provides:

It is the Company's intent, however, to utilize all its equipment and facilities in performing work in its own organization. In the event that a situation should develop whereby the equipment and facility limitations are not available or sufficient to perform such work, the Company will confer with the Union in an effort to reach an understanding with respect to how the problem is to be resolved.

This clause does not purport to allow US Airways to take any unilateral action at all. Instead, it simply requires the parties to "confer." The System Board of Adjustment made this very point in the Dunsford Arbitration, rejecting US Airways' reliance on the equipment and facilities clause as outsourcing authority. US Airways thus attempts to revive *two* arguments explicitly rejected by the System Board, while at the same time insisting that the Dunsford Arbitration is part of the CBA and binding on the parties. *See supra* at 8. Rather than support a broad right to outsource, the "equipment and facilities" clause demonstrates that the parties contemplated a variety of situations in

---

[10] US Airways' construction of the CBA renders Section (I) of the Second Clarification superfluous. If, as US Airways argues, the second sentence in Section (G) allows US Airways to outsource all work that cannot be performed due to lack of facilities, there would be no need for a separate Section (I) specifically dealing with the outsourcing of engine overhaul work "[d]ue to lack of facilities."

which "equipment and facility limitations are not available or sufficient," but restricted US Airways' right to outsource to certain narrowly defined situations.

I see this situation as similar to that confronted by the Seventh Circuit in *Brotherhood of Maintenance of Way Employees v. Atchison, Topeka & Santa Fe Railway Co.*, 138 F.3d 635 (7th Cir. 1997). The dispute in that case was whether the parties' collective bargaining agreement required the railroads to compensate maintenance workers for travel expenses. *Id.* at 638. According to the union, the CBA obligated the railroads to compensate all traveling employees, whereas the railroads insisted that their obligation was limited to reimbursing "regional and system gangs." *Id.* The CBA, however, simply referred to "employees." *Id.* at 640. The Seventh Circuit rejected the railroads' attempt to construe "employees" narrowly:

> Either [parties'] view is logically possible; neither is barred by the explicit terms of Article XIV. But while the term "employees" *could* refer solely to regional and system gangs, there is no hint in Article XIV that "employees" actually bears the narrower meaning. . . . The railroads propose a theoretically plausible

distinction, but one that has no basis in the text. We would hold the railroads' view "frivolous or obviously insubstantial" and affirm the district court—if the act of interpretation were to stop at the four corners of the Agreement.[11]

*Id.* Unlike the railroads in *Atchison*, US Airways has failed to show that its arguments are even *theoretically* plausible. Rather, its Section (G)

---

[11] The court in *Atchison* nevertheless found support for the railroad's argument in the parties' bargaining history. *Id.* at 640-43; *see Conrail*, 491 U.S. at 311 (stating that courts must consider both implied and express terms of a CBA, as well as the parties' practice, usage, and custom). US Airways states that it relies on the parties' past practice of subcontracting aircraft maintenance work when in-house equipment or facilities are lacking. But the only "aircraft maintenance work" that US Airways claims to have outsourced is the *engine overhaul work* that was the subject of the Dunsford Arbitration. US Airways "past practice" of doing something explicitly authorized by Section (I) provides no insight into the meaning of Section (G) or Article 2(B).

19

argument is sophistry, condemned by US Airways' alternative—and equally insubstantial—argument from Article 2(B).

Ultimately, my disagreement with the majority reflects a different assessment of the meaning and purpose of the "arguably justified" standard set forth by the Supreme Court in *Conrail* for distinguishing between major and minor disputes. *Conrail*, as I noted above, explicitly recognized that any good lawyer can plead a major dispute as a question of contract interpretation, but that parties cannot circumvent the RLA's status quo requirement with "frivolous," or "obviously insubstantial" arguments. *Conrail*, 491 U.S. at 306-07; *see also Detroit & Toledo Shore Line R.R. Co. v. United Trans. Union*, 396 U.S. 142, 150 (1969) ("The Act's status quo requirement is central to its design. . . . [T]he power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worth-while for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce."). Because I believe that the majority is allowing the proffer of *an argument*, in and of itself, to satisfy US Airways' already "relatively light burden," *Conrail*, 491 U.S. at 307, I respectfully dissent.

A True Copy:

Teste: Clerk of the United States Court of Appeals for the Third Circuit

20